Good morning, Your Honors. May it please the Court, my name is Jacqueline Larson. I'm appearing on behalf of John Harris. I'd like to reserve two minutes for rebuttal. The opening brief raises three issues. The warrantless entrance into the apartment, the probation search, and whether the appellant's statements were properly admitted. I'd like to focus this argument mostly on the first issue, unless, of course, Your Honors have specific questions about the other two. At some point, I'd like you well, go ahead. Just go ahead. As Your Honors know, the burden is on the government. It's a heavy burden to show that a warrantless entrance into a home was based on a specific exception to the warrant requirement. In the briefs, the government argues that there's sufficient evidence either to find that somebody inside the apartment was in danger or that the officers themselves were in danger. And the defense argues that there was insufficient evidence of either. From the 911 call, there was evidence that there was a man and a woman inside the apartment. There's a little more evidence than that. Oh, yes, Your Honor. She saw a man dragging a woman by the hair and putting her in this particular apartment. And then she heard a lot of banging noise inside. Yes, Your Honor. And the police were aware of that. Yes, Your Honor. And they thought they were coming to a family dispute of some type. Yes, Your Honor. But once they got to the apartment, there was no noise, and the woman herself answered the door. Well, you forgot. The man looked outside, saws the cops, and quickly closed the drape. And then she opened the door. Yes, Your Honor. And your brief said there was no blood on her face, so there's no case. No, Your Honor. The argument is that since the woman is standing there in no apparent distress, there's no reason to believe that there's anybody inside the apartment in danger such that they needed to cross that threshold without a warrant. Well, as far as if they didn't have any evidence of what happened before, you'd have a good argument. But did the police have to disregard that this person was violent, pulling a woman along by their hair? No, Your Honor. Underneath Brooks, United States v. Brooks, though, they need to corroborate. They can't only rely on the 911 call before crossing that threshold into the apartment. Okay. They got the call, but then they interviewed the witness who made the call, and they could make a determination of whether she was telling the truth or not. They can interview the witness. They can interview the woman who answered the door, the victim herself. But you left out the part that they had more than a 911 call. They had a discussion with the person and drew determinations there, whether she was telling the truth and whether this was a serious problem. I don't believe the record reflects that, Your Honor. I believe that they got the 911 call. They went to the apartment. They went straight to the apartment. The informant actually did say that they went to her first, but the police said not. Right. The police testimony was that they went straight to the apartment. And she actually, I think, also said that she didn't even talk to them or she didn't want to talk to them when they came. Right. Yes, Your Honor. So I don't believe that there was sufficient corroboration from, there was any corroboration of the facts in the 911 call before they got to the apartment door. So they got to the apartment. They had a 911 call. They saw the man peek out the window, and then the woman herself opens the door. At that point, they have reason to believe that there's a man inside. They have no reason to believe that he's in danger. They have the woman in front of them. They have no reason to believe that she's in danger since she's standing there. They don't talk to her. At what point, but at some point, they say they heard banging around in the kitchen. Was that before or after they went into the apartment? It must have been after because the banging noise was from the 911 call. I know that, but they also said they heard noise from the kitchen. Oh, that was after they entered. That was after they entered into the apartment, and then they heard the banging coming from the kitchen, and they turned and saw the defendant. So before they cross that threshold, they have the 911 call and the peek at the window. Well, I mean, suppose we thought that going into the apartment in the first place was justifiable given everything that had gone next before that, but then what happened was they did a quick look around. They knew there was nobody else there. They had the guy in handcuffs. Yes, Your Honor. So how does that feed? And then they went into the kitchen. So do you need, I guess what I'm saying is does the exigency dissipate at some time even if it exists to begin with? I would think so. I would think at some point they would need either to have a warrant once they know that nobody inside is in danger. Wait a minute. Once they decide someone is in danger, they walk away and they can assume, they could assume that there's a chance this may go on. There's been a vicious attack on a woman. Now she's a woman is standing there. The police look and see. She answers the door. They turn around and walk away. I guess there's no problem here. She opened the door. They can talk to her, Your Honor. They can get her consent to enter. They can confirm that an incident happened. They can investigate. There is precedent that says if the officers don't have probable cause to reasonably believe that somebody inside is in danger, they can investigate. They can ask questions. The officers take the position that they needed to be there for her protection and for their protection because they didn't know where this violent person was. Doesn't that make some sense? Your Honor, I would disagree because every time that an officer responds to a 911 call, what is happening inside that apartment is going to be speculation. They don't know. That's the point. They don't know so they're in there to protect people who may be in danger. But there needs to be specific facts that can be pointed to that the government can point to to show that an exception applies so that they can walk into the house. A 911 call alone is not sufficient. So that would be my argument is that every time that an officer responds to a 911 call, whatever is going on inside the apartment is pure speculation. They don't know. One question I have is the facts here do seem pretty close to Brooks. You seem to think that Brooks was somehow different. How is it different? How is Brooks different? Brooks is different because when the officers went to the apartment, instead of simply entering when they didn't hear anything, they talked to the defendant. They confirmed that an altercation had existed, had taken place. They confirmed that there was a woman inside out of sight and the officer could see that the room was in disarray. None of those exist when the woman herself opened the door than in this case. There's no victim out of sight. There's no victim they have to check on. They can talk to her as opposed to in Brooks when the defendant opened the door and they talked to him. Suppose we thought that you were right about this. Where does the parole search issue come in? The district court didn't decide it. Is that right? Correct. The district court decided that the officers acted reasonably given all the circumstances. I think that it was raised below to hedge the argument that even if the entrance was allowed, the officers could have done a probation search anyways. I would argue, as we did in the opening brief, that there's insufficient evidence to believe that the defendant actually resided there at that address. The evidence was that he had been staying there for two weeks, that he had clothes there, and he had keys to the apartment. All of that only came through Evans' statement before the search took place. What was actually found during the search, we argue, cannot be used in order to justify the search in the first place. You never really addressed the question whether it matters that it doesn't appear they would have known anything about this guy and that they wouldn't have done the... In other words, I don't know why the parole search issue is relevant to anything in the sense that if you're right that the first entry was invalid, then how would they ever have gotten any of the information that led them to do the parole search? I agree, Your Honor. I think the argument I think it was initially raised just kind of to hedge our bets in case the government argued that it was inevitable that they would have found the evidence because they could have just done a parole or probation search. And you're saying what? That they couldn't have done the parole search, but you're not saying it wasn't inevitable? Even if it was inevitable, they still couldn't have done it at this address. Yes, I see. Okay. But you're not arguing that it wasn't inevitable? I don't think it was raised. I see. Okay. Thank you. We'll give you one minute in rebuttal. Thank you. May it please the Court. Good morning, Your Honors. Christian Highsmith on behalf of the United States. The officers in this case acted reasonably in responding to a volatile and fast-moving domestic violence case. They made an on-the-spot decision based on objectively reasonable circumstances to enter the house to protect a victim and themselves from imminent harm. First of all, I mean, there are various pieces of this that are relied on that I don't understand. How is the fact that the guy looked at them through a window irrelevant to anything? There are a couple of reasons for its relevance. First... I mean, I never let anybody in my house without looking through a window. I didn't catch the last part. I never let anybody in my house without looking through a window. And at that point, they hadn't said they were the police, had they? They were clearly identified in the police. I'm not sure the record reflects whether they... My understanding is that when they knocked the second time, they said police. Yes, Your Honor. It's relevant for a couple of reasons. One, it's confirming what the 911 caller said. There's a man involved. Second of all, the man opens the window blinds, closes the window blinds, and then retreats. He doesn't open the door. He retreats back into the house for 15 to 20 seconds. It's a significant amount of time, given that we've got a domestic violence call reporting that a woman had been dragged by her hair, and then that there had been, once that the two parties went up to the house, that there had been loud banging sounds inside of that house. That fact that he withdraws into the house and does not open the door is very relevant. All right, but then they knock on the door, and she comes to the door, and she doesn't seem to have anything wrong with her, and they don't say anything like, did anything happen, or do you need us, or what's going on here, or anything. They just go in the house. This is a volatile situation because of the domestic violence context, because of the call. The officers, it is not dispositive that she wasn't bleeding or that she wasn't crying. It may not be dispositive, but it's relevant. It's relevant, but at the same time, these officers, as they testified at the suppression hearing, have substantial experience in domestic violence cases, and that the victim does not always present with obvious physical harm. All right, so then they come in the house, and one of them goes quickly through to see if there's anybody else there that isn't. And then they put the guy in handcuffs because he's sort of acting weird and uncooperative, and then they go in the kitchen. Don't they continue to have to have exigencies to continue to look around? They do. It's one protective sweep. This is a very fast-developing situation because, as the record reflects, it's a small apartment. So what happens is they go into the apartment. The moment the first officer, that's Officer Canapa, enters the apartment, he hears a thud coming to his left from the kitchen. He thinks it's a weapon. He looks over. He sees Mr. Harris crouching by a corner, not by a corner, but by a gap between the stove and the wall. At that moment, these officers have several concerns. There's a concern for a weapon in that gap. There's a concern for whether or not the victim is hurt, whether or not the victim … But if they had a weapon, he's already in handcuffs. He quickly comes back, yes, Your Honor. He's in handcuffs at that time. But the situation has … The apartment has not been secured. Harris himself, and we know that because Harris himself runs. I mean, he could have gone back to the gun and gotten it, but moreover … Handcuffs. He was in handcuffs. Absolutely, Your Honor. … that frequently or commonly in these circumstances, victims are also … Potentially could access the gun. They don't want their husband to be put in jail. They have no objective reason to think this guy had a gun. They do have an objective reason to believe that a gun was within easy access of both the victim … They had some history of him having guns. What happened downstairs had nothing to do with a gun. Because of the thud. Because of the sound, Your Honor. So a thud is a gun. In the context of a domestic violence situation where there's a woman who's been dragged by the hair, where there's loud banging inside, they go into that situation. They have experience with domestic violence situations. They have experience responding to these very volatile situations. How would it be unreasonable to make sure that there was no gun there? I mean, there's a gun in a small apartment near a victim who's not secured, and a suspect who's been acting in an agitated fashion, who has been refusing to answer questions, basic questions. What's your name? What's your probation parole status? The scene was not secure, and we know that because the defendant ran, but also because the victim at that point was not … So it's the government's contention that the scene was not secure, and it was a very limited sweep. He didn't go sweep. He didn't open anything. He just went right to where he thought the thud was in a short period of time after he entered the house. He goes over, sees where the thud is, looks down, just to confirm that there's a weapon or no weapon there to make sure that the apartment is safe. So under these circumstances, it was entirely reasonable to very briefly sweep for people and weapons after the thud. And the district court was correct in concluding both that the officer's testimony was very credible, that they were extremely believable, and therefore ruling that they acted reasonably under these circumstances. The court also did not clearly err in concluding that the officers acted reasonably in conducting their probation parole search. Before conducting that search, they conducted an interview of Ms. Evans. Ms. Evans told the officers she and Mr. Harris were husband and wife. They had broken up. They had gotten back together. Recently, Mr. Harris slept there every single night for the past two weeks. Mr. Harris drove her to work. Mr. Harris looked after her son. She gave Mr. Harris a set of keys to the house. He had a set of keys to the house. Very reliable statement that he was on probation or parole and that he was — and that he resided at that house. If we were to think that the original interview was not valid, I don't understand you to be arguing that the parole search would then independently be valid. You're just saying that the parole search was valid. As to why they got more things, it's because the parole search was valid if the original one was valid. Correct. What if the original one wasn't valid? We did not argue inevitable discovery, Your Honor. You did not? Did not. So if we thought the first one was invalid, then there would be essentially no reason — would there be a reason to remand on the parole question or not? I think there is, Your Honor, because I think you've got a 911 call where you have a domestic violence situation. They don't have time to check the suspect's parole status, but there would be a reason. There is an inevitable discovery issue because they could simply have run the parole status after getting the 911 call. So you're saying that you haven't argued it up to now, but we should give you the opportunity to argue in the district court? Yes. Is that what you're saying? Yes. And unless the panel has any other questions, I'll submit on the argument, Your Honor. Okay. Thank you. Thank you. Thank you, Your Honors. The district court decided below, as the government stated, that the officers acted reasonably given the circumstances, but the defense's position is that the circumstances simply weren't there to show that an exception existed to allow them to enter into the apartment. We heard a lot of generalities about what happens in domestic violence situations, but I think that the government needs to point to specific facts at the time of the entrance. The real difference between you – well, first of all, is there a difference between the exigency and emergency exceptions, or are they the same? Yeah, I'm not sure, Your Honor. Right. But the difference between you seems to be how sure they have to be that there is an emergency or an exigency. Yes. Essentially. Yes, I agree, Your Honor. And I would argue that it's – a peek out the window simply is insufficient, even given all the other circumstances. It's – Well, but they did know that there was a violent scene between these two people before. It was not corroborated. And they did know – okay, but they didn't have any reason to doubt it. I mean, the statement is – well, that was the – the ultimate statement was that many people had seen this,  Correct, Your Honor. and they knew that there was a man and a woman in the apartment. Yes, Your Honor. That's what they knew. Yes. There was a peek out the window, so they knew that the man inside was aware of their presence. But to raise that to an emergency, I believe, simply stretches the use of the word emergency. It wasn't just a peek out of the window. It's a peek out of the window, finding out who they are, and then quickly drawing them. And not for him to go to the door. There's a good deal of time between then and when the door opens and the woman is there, and he's over someplace else. Yes, Your Honor. So it's more than just a peek out of the window. Yes, Your Honor. And a pause. Yeah. But what happens during that pause is pure speculation. Of course. But these officers are trained in domestic violence cases, which are very volatile. If they had guessed wrong, I mean, you could have a death. You could have an injury. Yes, Your Honor. And so they have to make judgment calls. And so the district judge who reviewed it and listened to the police officers thought they were very credible, and they were acting reasonably under the circumstances. But that still doesn't excuse the government from pointing to specific facts. I would argue more specific than a pause before the door is opened. More specific than a person dragging the hair of a person across land and then putting them inside the house and then banging noises. Yes, a 911 call. There wasn't evidence, was there, that they dragged them up the stairs to the apartment? That wasn't the evidence? No. The evidence was that the 911 call reported that she started to run away from the man and he yanked her back with her hair. And then together they walked up to the apartment. All right. Thank you very much. I have a question, Judge Berzon. Okay. Go ahead. They've been back living together for a couple of weeks. Now, how long do they have to live together to be restored to husband and wife? Why isn't the inference that they were husband and wife living together? Your Honor, my argument would be that that information only came from the statement of Ms. Evans. What's wrong with that? Well, under Howard, more information, more factors are needed than simply the cohabitor statement to show. Why is that? Now, here is the wife saying, we're together. So why isn't that enough to act upon? I believe, Your Honor, that more is needed for probable cause for exactly this sort of situation, where the cohabitor herself is the one who owns the apartment and the crack cocaine was found in the apartment. One cohabitor statement alone simply is insufficient. Why is it insufficient? Well, under Howard, more than one factor is needed, and that would only be one factor. Well, they also found some of his keys. They also found some of his clothes. They found that during the probation search. They knew about the keys. No, I don't believe they knew about the keys. They called him. From Evans, right. Right. They had Evans' statement that all of these things existed. Right. So I believe that her statement alone, that he had keys, that he spent the night there, et cetera, et cetera, is only one, only meets one of the Howard factors. I see. I don't get your point. Judge Noonan, anything else? All you need is evidence of the Howard factors, that it comes from one witness or three witnesses or ten witnesses. It's whether or not the evidence is there. Well, my argument is that it's only one piece of evidence because it's only Evans' statement. I understand your argument, but it doesn't make an awful lot of – well, thank you for your explanation. Okay. Thank you very much. We will take a brief break, and then we will come back for the last two cases. Thank you.
judges: Wallace, Noonan, Berzon